All right, our final case for this morning is United States v. Young. Mr. Lange. Good morning, Your Honor. Attorney David Lange, and may it please the Court. Attorney David Lange on behalf of the appellant Dean Young, Your Honor. Your Honor, this is a criminal matter that the district court and the district judges are believed, because he never determined what the loss from the fraud was. Because the parties stipulated it. The parties did stipulate. That's our biggest problem, I would agree, that there was a stipulation on a plea agreement in that regards of what spelled out the facts in the complaint. It took about two to three pages going through the complete history of this, of Mr. Young's appeals and processes through the Veterans Administration. So the stipulation is down to the penny. I mean, how is the district judge supposed to guess that some finding on the amount beyond the number 201 and some thousand is necessary? People stipulate all the time to things like that. They do, and it's almost like a contract in the way Mr. Young looks at it. It's a waiver, isn't it? Well, we believe that it's ambiguous. What's ambiguous about it? That doesn't reflect the actual amount of the loss. But it's not ambiguous. The amount of the loss really should have been calculated from 2007 to 2016. That's your argument if only the back injury is in dispute, right? Correct. And part of the compromise here was that the PTSD benefits were taken out of the equation by the government, right? That is correct. So it sounds like you want the good parts of the deal, stick the government with that. It has to comply with the terms of its plea agreement, right? That is correct. And you want to reopen the part because you think it can benefit you, only the other part. I think there was a lot of negotiation that went on. I think the problem that happened with the PTSD is I think the government would have had a difficult time proving that and proving how that would have been related. That's why parties compromise and stipulate. They do. And what nobody actually ever did, nobody actually ever looked at the fraud amount. Mr. Young never got credit that he actually had and went before the courts in 2003, the Veterans Administration, before there was any fraud or anything else. And then the fraud doesn't start until after that. He got 60% after that in 2003. But they look back and there are retroactive adjustments that are made. I mean there is a long history of this. He gets turned down a lot. He takes appeals. He gets the money until August 2013 when the doctor obviously suspects something is wrong and watches him in the parking lot and the whole thing starts to unravel. But I don't see why that in any way deprives him of the ability intelligently to compromise on the amount of money that's attributable to back problems and to agree in this stipulation that it's the $201,000. I'll just call it that. We don't care about the $500. That's what he did. And it's just exactly as Judge Hamilton said.  What person would agree to this? Except the answer is plain. He agrees to it because he gets rid of the risk that the PTSD amounts will also be in there and it would be in the $400. Now, maybe not. Maybe he found one more witness. I don't know. But people always negotiate in the shade of some uncertainty. But as it's spelled out, what should have been looked at as far as in the site and I understand what the court is saying about the waivers. In the government's brief, what they're looking at is they're looking at in Newman and their cases that are cited, they're looking at the particular conduct. But it's a bottom line determination. A critical issue in the case has been taken off the table because the parties agreed. And the argument is that it really wasn't specifically understood. It was ambiguous to our clients at Mr. Young. Suppose you get past the waiver problem and we get to plain error and we need to figure out whether substantial rights were affected, whether the integrity of reputation of the proceedings was undermined. I would have thought, at least my understanding of the law here, is that intended loss also counts beyond actual loss in fraud schemes. Right? Right. And the reason this scheme came to an end was the doctor saw Mr. Young walking around putting his wheelchair in the back and the investigation began. Why would it not be reasonable if we remanded this for the government to argue that, in essence, Mr. Young was intending to obtain fraudulent benefits for the rest of his life? Well, I think the government could argue that, but the problem that the government would have in that is that we have Mr. Young initially making an application in 2002. He had 20% before that. He goes up to 60% with no fraud, with no use of wheelchairs, with no use of a cane in 2003, in November of 2003. That goes on until his benefits increase in 2007. I understand that point. I don't see how that's responsive to the possibility that if this issue gets opened up for full litigation, which is what you seem to want, that it would be quite reasonable to argue that the intended loss would include 20, 25 years' worth of fraudulent benefits he intended to get and hoped to get. I think the government could present that, and I think we'd have an argument on the other side saying that that was never the intent of Mr. Young. It's a lot of exposure, I think, is what Judge Hamilton is saying. That could easily go back well above the 400,000. Right, but we would rely upon the reports and the doctor's reports and the X-rays and the MRIs that are done in 2002-2003 and the medical opinions of the doctors that evaluated him in 2002-2003 that gave him the 60%. It's not until after that when he tried to get additional benefits, as I think, so I don't know how the exposure would be increased, because it's not until after he gets the 60% that he tries to get more. He tries to get housing benefits and everything else, and that's how this fraud comes in light to the government, is when he's filing in 2013 for not more in regards to the permanency, because he's already at 100% because of the PTSD and of the 60% on the back. But what he's looking at trying to do is he's looking at trying to get housing benefits and an increase there, and that's when the doctor sees him in the parking lot, and that's when they do their investigation. And which leads the government to conclude that they've been paying him not just housing benefits obtained fraudulently but... Disability benefits. Monthly benefits, right? They have, and I think... Going back a long way. I mean, it causes them to revisit the entire record, and they make some retroactive determinations. Right, without ever looking at what he should have got credit for in regards... It sounds like you want to have a trial. Do you want to undo the plea? No, no, we're not challenging... PTSD is back in the pool. We're not challenging at all the conduct. He went through the conduct. The conduct is there, the conduct of the fraud. He admits to the elements in the crime. He admits to the plea colloquy with the judge. He admits to that. Just in regards to the levels and the amount of loss attributable to the fraud. But I can't see. In the sentencing, you keep saying ambiguity. The quotation, the parties used this figure, that's $201,521.41, to calculate the guidelines as restitution and as the ultimate figure involved in settling the case without the risks to both sides from the trial, period, close quote. If that's not clear, I don't think anything could be. Well, I think in Mr. Young's case, I think he thinks that was ambiguous. When you look at the sentencing, when you look at the plea colloquy that the judge had in going over that. The judge notices the hesitation, right? Correct. But then it really just sounds like buyer's remorse or trying to undo the parts that you don't like and hang on to the parts you do like, which Judge Hamilton was talking about a minute ago, neither of which works. Right. That's not it. We're trying to get credit. I think the argument could be made on the other side that there was actually no loss attributable to this fraud. Yes, there was a fraud, but there could be an argument that there was no loss because he never got the increase in benefits. He never got the increase in benefits in 2013 that he was going for. He actually had had the disability benefits in 2003 legitimately. Well, okay. If you'd like to save a tiny bit for rebuttal, you can do that. Thank you, Your Honor. Mr. Roach. May it please the Court, William Roach on behalf of the government. I was trial counsel in this case, negotiated the plea agreement with the defense attorney in the case, poured through the thousands of medical records with defense counsel. So to argue to the court that no one looked at the fraud amount is flatly wrong. We looked at that amount very closely. Attorney Phillip, in his documents, sentencing memo to the court, references pouring through the reports. Attorney Phillip's sentencing comments to the judge. We looked through the records, and this is the stipulation that the parties reached in this case. So just to nail this down, this 201,000 and some figure uses what year? 2003 or so is the starting point? Yes. Appreciate that this is a complex analysis that was done by the VA. So this number, the 201,000, originally was calculated by the VA, given to the parties through various documents that we reviewed, and that was the number we agreed on. And effectively what happened, how they reached the 201,000, is they extracted out the PTSD. Yeah, they had to hire the 400 and some. 400,000 with the PTSD. But with the 201,000 figure, that essentially was figured from July of 2001. So putting this into a chronology, in May of 2002, the defendant was given a 20% disability rating, but it was made effective July 30th of 2001. So when the VA starts looking at all of these numbers and the amount of the fraud, it was at 60% and then 100%. But when they calculated what truly the defendant was owing, they calculated 20% from July 30th of 2001 as the effective date for what the defendant should have been receiving, which is the 20%. So that's how we got to that number. And to say that this is a number that was ambiguous to the defendants is just flat out wrong in this case. That number was referenced in the plea agreement. If you look at the government appendix, it was specifically agreed to by the defendant. I agree that the amount of the loss in the factual basis here is $201,000 and not $500,000. Then at the time of the plea, the defendant, through his attorney, acknowledged that that is the amount not only of loss, but it's also the restitution amount that we agree to. In the defendant's sentencing memo, we don't have any issue with the loss amount here. We're going to agree to that and the guidelines. And then before the district court at sentencing, the same statements are made. So that is correct, and that's the government bargain that was reached. The $400,000 figure from the PTSD gets reduced to the $201,000, and we make what potentially is a very, very complex trial, very complex issue setting loss to an agreed amount that's not pulled out of the sky, but calculated to the penny by the VA and then verified by the various medical records. Mr. Roach, as it is PTSD, what do the records show as to where that was developed? I understand the back injury. What's the connection to PTSD, considering the times of service? There were a couple of PTSD claims. One involved the defendant asserting that he was present when a fellow Marine or paratrooper parachuted out of a plane, and Mr. Young was there and observed a death. So one soldier fell on top of another that died, and Mr. Young observed this, and this caused trauma to him. There were a couple of other PTSD claims, one involving him being on a shooting range when a fellow soldier was shot through accidental fire. And he received treatment for that? He was in and out of treatment for that, met with various medical professionals to assist him with that. As you've read in the sentencing transcript, the sentencing memo, the defense found some witnesses to buttress his claims. There were some that were skeptical. The VA investigation was a little skeptical of some of his initial claims, but settled away. In short, the government believes it should receive the benefit of the bargain here, the defendant getting nearly $200,000 lopped off, and fairly so. But fairly so to the government, we should be entitled to what we negotiated, a stipulation. And that, frankly, is wavering the government's view. So absent any other questions, I certainly would. Just a comment. If we get to the plain error issue, your brief argued that the claimed error would not have affected Young's substantial rights or the fairness and integrity of the proceedings. Yes. And I think the Supreme Court has rejected both of those arguments rather definitively in the last couple of years in Rosales-Morales and Molina-Martinez, so that if there is, in fact, a guideline error, that argument would run into trouble, and if it had not also been waived. Very good. Anything further? All right. Thank you very much, Mr. Roach. Anything further, Mr. Lyon? I think I'll give you a minute. Just two things in comment. First of all, in regards, I guess I may have misspoken in regards that when the VA made its decision in 2016 in a hearing in that regards, it did go back all the way to 2001. My client at that time, there was no fraud from 2001 to the time that he got the 60%. Your Honor also brought up the Molina-Martinez case. I think if the court looks at that case, too, where there was a dispute or a problem in regards to the criminal history, and Molina-Martinez, who went pro se, made a complaint that nobody caught in the district court or all the way through up that she should have been given one count instead of five counts in regards to the criminal history category because she committed five burglaries on one day or five aggravated batteries in one day. And I would suggest that that's sort of similar to what happened here in this regards. Nobody caught that there wasn't a calculation. The only body that ever did a calculation here was the VA. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement, and the court will be in recess.